*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DAVID HOCHEISER,

        Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY,
*et al.*,

        Defendants.

Civil Action No. 17-06096 (FLW)

**OPINION**

**WOLFSON, Chief Judge:**

Plaintiff David Hocheiser ("Plaintiff" or "Hocheiser") brought this action against Defendant Liberty Mutual Insurance Company ("Defendant" or "Liberty"), for the recovery of disability benefits pursuant to the Wells Fargo & Company Group Disability Income Policy, (the "LTD Policy"), under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001(a)(1)(B), *et seq.* ("ERISA"). Presently before the Court are Motions for Summary Judgment; Hocheiser moves for summary judgment seeking to reverse the termination of his benefits, and Liberty cross-moves for summary judgment. For the reasons that follow, Liberty's motion is **GRANTED**; and Plaintiff's motion is **DENIED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Hocheiser, who was born in 1969, was 51 years old at the time these Motions were filed. (Plaintiff's Statement of Undisputed Material Facts ("Plaintiff SOF"), ¶ 1.) Prior to ceasing work at age 44, Hocheiser was employed full-time by Wells Fargo & Company ("Wells Fargo") as a mortgage consultant. (Plaintiff SOF, ¶ 2.) In his last full year of employment with Wells Fargo, Hocheiser earned $471,211.62 in salary and commissions. (Plaintiff SOF, ¶ 20.)

Hocheiser began reporting lower back pain in 2005. (Liberty's Statement of Undisputed Material Facts ("Liberty SOF"), ¶ 21.) From 2005 through 2011, he sought treatment for the pain with chiropractor, Russell Brokstein, who is Hocheiser's brother-in-law. (Liberty SOF, ¶ 21.) In 2011, however, Hocheiser began experiencing more widespread pain, including tingling and numbness, and in July 2011, Dr. Dean Filion, a spine and sports medicine physician, diagnosed Hocheiser with mild acute left lumbar radiculitis, multilevel lumbar herniated nucleus pulposus at L4-5 and L5-S1, multilevel lumbar stenosis, resolved cervical strain sprain with myofascial pain, and stable median neuropathy at the wrists. (Plaintiff SOF, ¶¶ 23-24.)

Sometime in July 2013, Hocheiser exacerbated his back pain "getting out of the shower" a day after he was moving some boxes. (Plaintiff SOF, ¶ 26.) At a chiropractic appointment later that month, Brokstein noted that Hocheiser's condition was "worse" and performed electric stimulation and hydroculation therapy treatment for the first time. (Plaintiff SOF, ¶ 26.) Hocheiser continued to experience worsened cervical and lumbar spinal pain over the next several weeks, to the point where it became difficult to sit during the day and sleep at night. (Plaintiff SOF, ¶ 27.) Brokstein referred Hocheiser for cervical and lumbar imaging. (Plaintiff SOF, ¶ 28.) As for the cervical spine, the imaging revealed that although curvature and alignment were normal, and there was no compression fracture, Hocheiser suffered a disc herniation at C6-7 resulting in "mild-moderate right-sided central canal stenosis" and possible ventral right cord impingement. (Plaintiff SOF, ¶ 29.) As for the lumbar spine, imaging revealed multilevel degenerative disc disease with facet arthropathy of the lumbar spine, most notable at L4-5 and L5-S1. (Plaintiff SOF, ¶ 29.)

### A.     Liberty Approves Hocheiser's Claim for Short Term Disability Benefits

On September 24, 2013, Hocheiser ceased working, and on the following day, he submitted a claim for short term disability benefits, claiming that he was unable to work due to lower back and neck pain.  (Plaintiff SOF, ¶ 30; Liberty SOF, ¶ 36.)

From October 2013 to January 2014, Hocheiser consulted with a variety of medical professionals regarding his pain, including neurosurgeon Dr. Patrick F. O'Leary, orthopedic surgeon Dr. Alexander Vaccaro, rheumatologist Dr. Ronald MacKenzie, neurologist Dr. Jonathan Goldstein, physiatrist Dr. Alexander Simotas, physical therapist Linda Lennox, sports medicine specialist Dr. Dhimant Balar, neurologist Dr. Megan Leitch, and neurogeneticist Dr. William Johnson.  (Plaintiff SOF, ¶¶ 33-56.)  Although most of Plaintiff's treating physicians did not provide findings about Hocheiser's ability to work, Dr. Leitch and Dr. Simotas did.  (Plaintiff SOF, ¶¶ 33-56.)

During his visit with Dr. Leitch, Hocheiser reported that he was "concerned that he has a genetic condition" because all three of his children have been clinically diagnosed with acromicriodysplasia.  (Plaintiff SOF, ¶ 47; Liberty SOF, ¶ 54.)  Upon examination, Dr. Leitch found Hocheiser to be "well developed, well nourished, in no acute distress" with "normal full range of motion of all joints." (Liberty SOF, ¶ 54) (citing ECF No. 72 ("Admin. Record") at 2058.)  However, Dr. Leitch noted the presence of muscle stiffness and neck and back pain.  (Admin. Record at 2061.)  Dr. Leitch prescribed baclofen for stiffness and pain and noted that he was "not sure how long the patient will be unable to work," but "he should remain off of work while we continue to investigate what might be the cause of his symptoms." (*Id.* at 2061.)  Similarly, Hocheiser informed Dr. Simotas that "[t]here has been some agreement that he [has a] familial, disease problem which is acromicro-dysplasia [which] is clinically related to his current

symptomatology."   (Liberty SOF, ¶ 55) (citing Admin. Record at 3807.)   Following an examination, which revealed reduced flexion and extension, Dr. Simotas stated that Hocheiser "is in significant pain stiffness and unable to function at a normal level to sustain employment. . . . He is unable to work and expect recovery to take at least 2-3 months."  (Admin. Record at 3808.) Neither Dr. Leitch nor Dr. Simotas made any finding of a genetic cause for his condition.

Based on these examinations and diagnoses, Liberty concluded that impairment was supported through February 6, 2014, which was six weeks from Hocheiser's last treatment. (Liberty SOF, ¶ 57.)  Liberty also concluded that this would "give the time needed to continue diagnostic testing and . . . to attempt to determine the cause of [Hocheiser's] symptoms . . . ." (Liberty SOF, ¶ 54) (citing Admin. Record at 72.)  On January 21, 2014, Liberty called Hocheiser for an update regarding his treatment, and Hocheiser informed Liberty that he was scheduled for additional testing with neurogeneticist, Dr. Johnson, to determine if there was a genetic cause to his symptoms.  (Liberty SOF, ¶ 58.)  Accordingly, Liberty approved Hocheiser's short term disability claim through March 25, 2014, the full six-month duration of those benefits.  (Liberty SOF, ¶ 59.)

### B.    Liberty Denies Long Term Disability Benefits

Following Hocheiser's approval for short term benefits, Liberty opened Hocheiser's claim for Long Term Disability benefits ("LTD benefits").  (Liberty SOF, ¶ 60.)  Wells Fargo established and maintained an employee welfare benefit plan (the "Plan") that included short-term disability and long-term disability benefits.  (Liberty SOF, ¶ 2.)  To fund the Plan's LTD benefits, Wells Fargo purchased from Liberty a group policy of long term disability insurance, policy number GF3-850-289424-01.  (Liberty SOF, ¶ 4.)  The LTD Policy pays out LTD benefits equal to 65% of the claimant's Basic Monthly Earnings, subject to a $27,083 per month maximum benefit, if the

claimant proves he or she is "Totally Disabled," under the "Regular Attendance of a Physician," and receiving "Appropriate Available Treatment." (Liberty SOF, ¶ 5.) For the first 24 months, a claimant is "Totally Disabled" if, "as a result of Injury or Sickness, [he] is unable to perform the Material and Substantial Duties of his Own Occupation." (Liberty SOF, ¶ 6.) After receiving LTD benefits for 24 months, a claimant is "Totally Disabled" if he "is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (Liberty SOF, ¶ 6.) If the claimant remains Totally Disabled and continues to submit sufficient proof of such, he or she may be entitled to benefits until the age of 67, assuming none of the limitations apply. (Liberty SOF, ¶ 7.) Under the LTD Policy, "Own Occupation" is defined as "the Covered Person's occupation that he was performing when his Disability . . . began." (Liberty SOF, ¶ 8.) "Material and Substantial Duties" means "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." (Liberty SOF, ¶ 9.) As mentioned above, the LTD Policy requires the claimant to submit proof of continued Disability. (Liberty SOF, ¶ 11.) "Proof" is defined under the LTD Policy as "the evidence in support of a claim for benefits and includes, but is not limited to . . . the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits." (Liberty SOF, ¶ 11.)

By letter dated May 7, 2014, Liberty notified Hocheiser that he failed to meet his burden of proving long-term disability under the LTD Policy. (Plaintiff SOF, ¶ 128) (citing Admin. Record at 3454-3464.) Liberty based its decision on medical records obtained from Plaintiff's medical providers from July 25, 2011 to March 14, 2014, videorecorded observations of Hocheiser

between February and March 2014, and the opinions and findings of a vocational consultant, consulting physician, and consulting psychiatrist. (Admin. Record at 3454-3464.)

To support its decision, Liberty highlighted more than fifteen separate pieces of documentation, including treatment notes and imaging results, provided by Plaintiff's medical providers from July 25, 2011 to March 14, 2014. (*Id.* at 3454-55.) Specifically, this documentation included neurology treatment notes from Drs. Goldstein, Leitch, Johnson, and Hirano; orthopedic treatment notes from Drs. O'Leary and Vaccaro; chiropractic treatment notes from Brokstein; physical therapy notes from November 27, 2013 through March 3, 2014; and imaging of Hocheiser's lumbar spine, cervical spine, brain, and hips. (*Id.*)

With respect to the surveillance of Hocheiser, Liberty noted three specific observations on February 17, 2014; February 18, 2014; and March 28, 2014. (*Id.* at 3455.) Liberty noted that on February 17, 2014, Hocheiser was observed exiting his residence in the morning, driving himself to a private residence, and departing the private residence more than ninety minutes later. (*Id.*) While the investigator lost visual contact of Hocheiser after he left the private residence, it was verified that he did not immediately return to his own residence. (*Id.*) Similarly, on February 18, 2014, Liberty claims that Hocheiser was observed exiting his residence in the morning and driving himself to an unknown destination. (*Id.*) As visual contact was lost, the exact location could not be determined; however, the investigator confirmed that Plaintiff did not return to the private residence he visited the day before, nor did he return to his own residence by 12:00 p.m. (*Id.*) Finally, on March 28, 2014, Hocheiser was seen arriving at his residence in the afternoon, staying briefly, and then departing again. (*Id.*) According to the investigator, Hocheiser drove himself to a nearby flower shop, then driving to a Walgreens pharmacy drive-thru and returning to his home. (*Id.*)

As for the vocational analysis, Liberty's vocational consultant concluded "with a reasonable degree of vocational certainty," that "the typical physical demands of Mr. Hocheiser's occupations of Loan Interviewer are most often sedentary and light in physical demand with sufficient opportunity at both levels of exertion." (*Id.* at 3455-56.) In order to determine whether, in light of the medical conditions reported by his treating providers, any impairments existed, and if so, if those impairments would prevent Plaintiff from functioning in an occupational environment and performing his Own Occupation, Liberty consulted with a physician and a psychiatrist to review Plaintiff's medical records. (*Id.*) After reviewing Hocheiser's claim file, in addition to the paper medical records, which included conversations with Dr. Hirano, Dr. Simotas, and Dr. Leitch, the consulting neurologist found that although certain medical documentation and Plaintiff's own reports described incapacitating pain, the intensity of treatment did not reflect a severity of pain or muscle tightness that would prevent Plaintiff from working in an occupational setting to perform his Own Occupation. (*Id.*) Indeed, the consulting neurologist highlighted that there was no change in treatment modalities to indicate that Plaintiff's pain complaints were of a severity that would interrupt his work. (*Id.*) Finally, the neurologist expressly concluded that the genetic myopathy disorder which Hocheiser had raised, had not been validated by the testing and medical review completed by his providers. (*Id.*)

Regarding Hocheiser's anxiety diagnosis, the consulting psychiatrist similarly concluded that there was insufficient evidence "to support a severity of psychiatric symptoms and complaints that would prevent [Plaintiff] from performing [his] occupation from a psychiatric condition." (*Id.* at 3463.) The consulting psychiatrist also noted that there had not been an "intensity of psychiatric treatment" which would indicate impairment, and therefore, Hocheiser suffered no restrictions or limitations based upon his anxiety diagnosis. (*Id.*) According to Liberty, during a phone

conversation on March 27, 2014, Hocheiser advised Liberty that he has been on the medication, Zoloft, for roughly twenty years, and that he was no longer treating with a psychiatrist. Liberty noted that this disclosure further supported the consulting psychiatrist's conclusions. (*Id.*)

In denying the claim, Liberty also notified Hocheiser that he could administratively appeal the decision, and if he were to do so, he should include:

> all documentation, such as all treatment records to include, but not limited to: office notes, consultation reports, psychiatric notes, procedural reports, hospitalization records, physical and occupational therapy notes, diagnostic and laboratory test results, and all medications prescribed for the period of January 1, 2014 through the present from Dr. Filion, Dr. Goldstein, Dr. Leitch, Dr. Johnson, Dr. Hirano, Dr. Simotas, Dr. MacKenzie, Dr. O'Leary, Dr. Vaccaro, Dr. Brokstein, Dr. Rizvi, Dr. Broyer, and any other provider that you have treated with for this period of disability which you feel will support your claim.

(*Id.* at 3464.)

### C. Hocheiser's First Appeal of Liberty's Long Term Disability Claim Denial

By letter dated September 29, 2014, Hocheiser, represented by counsel, appealed Liberty's LTD Benefits claim denial ("First Appeal"). (Plaintiff SOF, ¶ 129) (citing Admin. Record at 3171-72.) In connection with his First Appeal, Hocheiser submitted additional medical records and numerous letters from his treating physicians, including Dr. Tariq Rizvi, Dr. Leitch, Dr. Simotas, Dr. Perry Herman, Brokstein, and massage therapists Kim Thormann and Charlene Boruch. (*Id.*)

Liberty assigned Hocheiser's First Appeal to Appeal Review Consultant Lindsay Mack ("Mack") to conduct an independent review of Plaintiff's claim with no deference to the initial determination. (Liberty SOF, ¶ 121.) In November 2014, Mack referred Hocheiser's medical records to independent medical vendor, MES Solutions ("MES"), requesting that MES perform an occupational analysis to assess Hocheiser's claim and engage a board certified neurologist to perform a review of Plaintiff's file. (Plaintiff SOF, ¶ 136; Liberty SOF, ¶ 127.) As part of the

occupational analysis, MES reviewed the vocational information, including statements provided by Hocheiser's former co-workers describing Hocheiser's work-related activities, and concluded that Hocheiser's "occupation is most often performed at a sedentary to light level of physical demand.  Tasks are similar in both physical demand levels of this occupation so classification will depend on the specific work environment." (Liberty SOF, ¶ 128) (citing Admin. Record at 3158.) MES noted that "part-time opportunity does exist in this occupation."  (Admin. Record at 3160.)

As for Liberty's request for a review by a board certified neurologist, MES selected Dr. Joshua Alpers.  (Plaintiff SOF, ¶ 137.)  Dr. Alpers provided a peer review report on December 2, 2014.  (Liberty SOF, ¶ 132.)  The doctor summarized the medical evidence available and, when asked to identify supported diagnoses, noted that "[a] formal neurological diagnosis has not yet been established for this claimant" and that Hocheiser "has had extensive evaluation attempting to attribute [his] clinical features to an underlying genetic disorder without success." (Admin. Record at 3151.)  However, Dr. Alpers also found that Hocheiser was "effectively incapable of working from September 24, 2013 forward." (*Id.*)  Dr. Alpers reasoned that although Hocheiser's exact diagnosis was unknown, there "appear[ed] to be a genetic basis" for findings of "muscle hypertrophy, pathological hyperreflexia, spasticity, mild weakness, and severe neck and low back pain." (*Id.*)  Accordingly, Dr. Alpers recommended that because "the exact diagnosis remains to be clarified and ongoing symptomatic management/optimization of his pain management is expected," the "case be reviewed again in two years." (*Id.* at 3151-52.)

Based on Dr. Alpers' report, Liberty overturned its prior denial of LTD Benefits in or around December 2014.  (Liberty SOF, ¶ 133.)  Accordingly, Liberty approved benefits from September 24, 2013, issued a retroactive payment to Hocheiser of over $200,000, and began issuing monthly LTD payments to Hocheiser in the amount of $23,573.97.  (Liberty SOF, ¶ 134.)

**D.** **Liberty's Continued Review of Hocheiser's Long Term Disability Claim and Its Termination of Benefits**

Because Hocheiser's First Appeal did not reveal a clear diagnosis, however, Liberty continued evaluating Plaintiff's inability to work and his right to LTD benefits. (Liberty SOF, ¶ 136.) Indeed, on December 12, 2014, Hocheiser called Liberty, seeking information related to the LTD Policy's partial disability provision, which applies to disabled claimants who are working in some capacity. (Liberty SOF, ¶ 135.) Although Hocheiser told Liberty that "since he is not working part time, it's not an issue," the conversation indicated to Shannon Wright ("Wright"), a claims manager working on Hocheiser's claim, that Hocheiser might be working or contemplating working in some capacity. (Liberty SOF, ¶ 135.) By letter dated December 16, 2014, Liberty informed Hocheiser that it would obtain periodic updates from his treatment providers to assess his symptoms and impairments, and would evaluate his claim on an ongoing basis to determine if his symptoms and impairments continued to prevent him from performing his occupation. (Liberty SOF, ¶ 136.) Liberty also requested that, in the meantime, Hocheiser complete several forms to provide an understanding of his current condition, including an Activities Questionnaire. (Liberty SOF, ¶ 136.) Finally, unbeknownst to Hocheiser at that time, Liberty contracted with a third-party private investigator, ICS Merrill, to conduct surveillance on Hocheiser. (Liberty SOF, ¶ 135.)

On December 17, 2014, Wright referred Hocheiser's claim to a consulting physician, noting that Dr. Alpers "was to determine an impairing diagnosis, but outlined symptoms attributable to a genetic disorder for which the claimant's genetic testing was negative." (Liberty SOF, ¶ 137.) Specifically, Wright asked that a reviewing neurologist indicate whether a genetic disorder is supported by the medical record and whether further review by a geneticist or other specialty is warranted. (Liberty SOF, ¶ 137.) Wright also requested medical records from Hocheiser's treating providers, and she noted that, once received, she would request that a

neurologic consulting physician review the updated information.  (Liberty SOF, ¶ 151.)  Liberty received records from Drs. Johnson, Leitch, and Herman, and physical therapy reports from Forsgate Physical Therapy.  (Liberty SOF, ¶¶ 152, 153, 158.)

On May 23, 2016, Liberty sent Hocheiser notice that his LTD Benefits were terminated at the end of the Own Occupation period.  (Plaintiff SOF, ¶ 163) (citing Admin. Record at 1183-97.)  Liberty did not compel Hocheiser to attend an in-person examination prior to terminating his claim.  (Plaintiff SOF, ¶ 163.)  Rather, Liberty determined that although "Hocheiser may continue to experience symptoms associated with his condition," based on the totality of its clinical and vocational reviews, "he is capable of full time sedentary work."  (Admin. Record at 1195.)  Specifically, Hocheiser could "perform with reasonable continuity the material and substantial duties" of his occupation or other alternative occupations, and "[t]herefore, he no longer meets the Wells Fargo & Company definition of disability beyond May 24, 2016."  (*Id.*)  Accordingly, Liberty concluded that the medical evidence available did not support a genetic disorder diagnosis, nor did the medical evidence and clinical reviews demonstrate that Hocheiser's claim of impairment related to his symptoms of chronic pain, muscle stiffness, and spasms, prevented him from performing full-time sedentary work.  (*Id.* at 1195.)  Liberty based this decision on medical records received from Hocheiser's providers; letters and correspondence received from Hocheiser and his attorney; surveillance, business records, and internet reports; and clinical reviews and a transferrable skills analysis.  (Admin. Record at 1183-97.)  In addition, Liberty also obtained information regarding Hocheiser's involvement in a previously undisclosed business venture, Fields of Dreams, LLC (also known as "Sportika"), which seeks to build and operate one of the largest indoor sports and entertainment complexes in the tri-state area.  Indeed, despite forming

the business on November 25, 2013, Hocheiser did not notify Liberty of his involvement until he

submitted the Activities Questionnaire in January 2015.  (Admin. Record at 2852, 3055.)

Liberty informed Hocheiser that should he wish to administratively appeal the

determination, he should submit the following documentation:

> Office treatment notes, therapy evaluations and progress notes, psychiatric evaluations, test results, discharge summaries, procedure reports, pharmacy records, restrictions and limitations and the evidence to support them from March 2014, through present from Dr. Leitch, Johns Hopkins Medicine, Forsgate Physical Therapy, and any other treating providers.
>
> Genetic test results including but not limited to ultrasonography, MRI, echocardiography, muscle biopsy and exome sequencing from March 2014 through present.  Please include the genetic test results conducted in early 2016 as well as any additional test results that have been conducted since.
>
> Proof of Mr. Hocheiser's current Social Security Disability status as well as all correspondence received from the Social Security Administration regarding his claim status since the initial application.
>
> Earnings statements from Field of Dreams, LLC (Sportika), Soccer Evolution Club and Premier Sportsplex, LLC, as well as any other sources of income from September 2013, through present.  In addition please provide a copy of Mr. Hocheiser's 2013, 2014 and 2015 Federal Income Tax returns with all schedules and attachments.

(*Id.* at 1196.)

### E. Hocheiser's Second Appeal of Liberty's Long Term Disability Claim Denial and Commencement of this Lawsuit

On November 21, 2016, Hocheiser sent a finalized appeal letter to Liberty ("Second

Appeal").  (Plaintiff SOF, ¶ 172.)  Liberty assigned Hocheiser's Second Appeal to Appeal Review

Consultant Nancy Winterer ("Winterer"), a Liberty employee with no prior role in Plaintiff's

claim. (Liberty SOF, ¶ 354.)  Winterer referred the file and specific questions to MLS, asking that

a physician certified in Pain Management and Rehabilitation and Pain Medicine review Plaintiff's claim file, including his medical documentation.  (Liberty SOF, ¶ 362.)

By letter dated February 18, 2017, Liberty notified Hocheiser's counsel that Plaintiff's Second Appeal was denied, because he had failed to meet his burden of proving disability. (Plaintiff SOF, ¶ 181) (citing Admin. Record at 143-63.)  In denying Hocheiser's appeal and affirming its decision to terminate LTD benefits, Liberty considered Hocheiser's entire claim file, including medical records and documentation provided by Hocheiser's treating providers; a Functional Capacity Evaluation ("FCE") and subsequent report issued by Ellen Rader Smith ("Rader Smith"); and evidence related to Hocheiser's business activities with Fields of Dreams, LLC/Sportika.  (Admin Record at 143-163.)  Based upon its review, Liberty concluded that although Hocheiser continues to experience back pain, stiffness, and other symptoms associated with his condition beyond March 24, 2016, those symptoms are not of such "severity, frequency and duration that they have resulted in restrictions or limitations rendering him unable to perform the duties of the occupations identified as being within his functional capacity and vocational skills, beyond March 24, 2016."  (*Id.* at 160-61.)  In denying the Second Appeal, Liberty informed Hocheiser that he had exhausted all administrative appeals.  (*Id.* at 162.)

On June 26, 2017, Hocheiser filed the instant lawsuit in the Superior Court of New Jersey, Law Division, Monmouth County, asserting the following causes of action against Liberty and Defendants, Christina Eagen, Shannon Wright, Lindsay Mack, Nancy Winterer, and Barbara Durling: breach of contract (Count I); bad faith (Count II); Willful, Wanton, and Malicious Conduct (Count III); violation of ERISA (Count IV), and Unfair Claim Settlement Practices (Count V).  (ECF No. 1 at Ex. A.)  On August 14, 2017, Liberty filed a Notice of Removal based

on federal question jurisdiction, pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction. (ECF No. 1.)

On March 23, 2018, the Court granted a motion to dismiss filed by Liberty and the individual defendants pursuant to Fed R. Civ. P. 12(b)(6).  (ECF Nos. 25 and 26.)  Specifically, the Court dismissed Plaintiff's common law claims, asserted in Counts One, Two, Three, and Five of the Complaint, with prejudice.  The Court also dismissed Plaintiff's claims under §§ 502(a)(2) and 502(a)(3) of ERISA, asserted in Count Four of the Complaint, without prejudice.  (ECF No. 26.)  Plaintiff was given leave to amend his Complaint for the sole purpose of asserting a claim under § 502(a)(1)(B) of ERISA.  (*Id.*)

On April 18, 2018, Plaintiff filed an Amended Complaint, asserting the following causes of action against Liberty and the individual defendants: breach of fiduciary duty (Count I), violation of § 502(a)(1)(B) under ERISA (Count II), and punitive damages (Count III).  (ECF No. 27.)  On January 11, 2019, the Court granted a partial motion to dismiss filed by Liberty and the individual defendants, in which the Court dismissed Count I and Count III of the Amended Complaint and dismissed Count II of the Amended Complaint as asserted against the individual defendants.  (ECF No. 47.)

On July 9, 2020, Plaintiff and Liberty filed the instant Cross Motions for Summary Judgment in which Hocheiser moves for summary judgment seeking to reverse the termination of his benefits, and Liberty cross-moves for summary judgment.  (ECF Nos. 77 and 78.)

## II.   <u>LEGAL STANDARD</u>

### A.   **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  Credibility determinations are the province of the factfinder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### B.    ERISA Standard

The Supreme Court has long held that a denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When a plan administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard.  *Miller v. American Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011); *Doroshow v. Hartford Life and Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009).

Here, however, Plaintiff argues that the Magistrate Judge, in the context of a discovery ruling, erred in ruling that the arbitrary and capricious standard applies.[1]   Plaintiff argues that

---

[1]     The Court notes that since the Magistrate Judge's determination was made in the context of discovery, that this determination does not bind my analysis here.  Thus, I will make an

although the Magistrate Judge previously determined that the LTD Policy contains language that would ordinarily trigger Liberty's discretionary authority, that prior ruling was incorrect because a later version of the LTD Policy applies to Plaintiff's termination of LTD benefits, and the grant of discretionary authority in that version of the LTD Policy is invalidated by Minnesota state law.[2] (Pl. Moving Br. at 13.)  Specifically, Plaintiff contends that although he became disabled in 2013, Liberty's decision to terminate his benefits occurred on May 23, 2016, and its final determination was made on February 18, 2017.  (*Id.* at 13-14.)  And, Plaintiff maintains that under Third Circuit law, the benefit plan in effect on the date the administrator makes a benefits determination governs the administrator's discretionary authority.  (*Id.*) (citing *Smathers v. Multi–Tool, Inc.*, 298 F.3d 191, 194 (3d Cir. 2002)).  According to Plaintiff, Liberty voluntarily and unilaterally amended the LTD Policy on January 1, 2016, changing the terms of the policy for Wells Fargo employees.  (*Id.* at 14.)  As a result, Hocheiser claims that Liberty effectively "offer[ed] or issu[ed]" a new policy as of that date, which thereby subjected it to M.S.A. § 60A.42, which bans discretionary clauses that apply to policies offered or issued on or after January 1, 2016.  (*Id.* at 14-15) (citing *Pierzynski v. Liberty Life Assur. Co. of Bos.*, 2012 WL 3248238, at *3 (E.D. Mich. Aug. 8, 2012); *Dallenbach v. Standard Ins. Co.*, 2019 WL 2425705, at *3 (interpreting application of Minnesota ban on discretionary clauses)).   Therefore, Plaintiff argues that M.S.A. § 60A.42 invalidates the discretionary authority in the LTD Policy and reverts the standard of review to *de novo*.  (*Id.* at 16.)

---

independent finding regarding the appropriate standard of review on these Motions for Summary Judgment.

[2]       The LTD Policy provides that it is "delivered in and governed by" the laws of the State of Minnesota.  (Admin. Record at 3920.)

I find that the arbitrary and capricious standard governs the review of the Administrator's decisions.  Plaintiff argues that M.S.A. § 60A.42 applies because Liberty ceased paying disability benefits in May 2016, after the statute's effective date.  (Pl. Moving Br. at 13.)  In support of his position, Plaintiff relies on *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191 (3d Cir. 2002), for the proposition that "it is the benefit plan in effect on the date the administrator makes a benefits determination that controls in determining whether the benefit plan gives the administrator or fiduciary discretionary authority." (*Id.* at 13-14.)  In *Smathers*, however, the Third Circuit held that the plaintiff had no vested right to benefits under the policy and, therefore, the plan sponsor had a right to amend the policy at any time.  298 F.3d at 196.  That is not the case here.  As Liberty aptly notes, the case that *Smathers* relied on makes clear that "the controlling policy is the one in effect <u>either</u> 1) when the employee has vested rights in benefits or 2) if the employee has no vested rights under the policy, when an ERISA cause of action accrues at the time that benefits are denied." *Dallenbach v. Std. Ins. Co.*, 2019 WL 2425705 (D. Nev. Apr. 8, 2019) (citing *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159-61 (9th Cir. 2001).  Here, the LTD Policy was amended four times: once on May 7, 2010 (Admin. Record at 3963); twice on December 22, 2010 (Admin. Record at 3965-3966); and once on September 14, 2016 (Admin. Record at 3967).  Each of those amendments unambiguously states that "[t]he changes will only apply to Disabilities or Partial Disabilities which <u>start on or after the effective date of this change</u>." (Admin. Record at 3963; 3965-3967) (emphasis added.)[3]  Thus, because the amendments to the LTD Policy only applied to disabilities that arose <u>after</u> the effective dates of those amendments, claimants, like Plaintiff, were vested with rights to benefits under the LTD Policy in effect as of

---

[3]       Notably, Plaintiff does not dispute the language of the amendments, nor does he argue that the language is ambiguous.

the date of disability.  *See Shane v. Albertson's Inc.*, 504 F.3d 1166, 1169 (9th Cir. 2007) (finding that when a policy has clear language that a claim is to be "provided for under the terms of the Plan in effect at the time [a] disabilit[y] commenced," the employee has a vested right in benefits beginning at the time of the alleged disability).  The LTD Policy, as amended in December 2010, applies to Plaintiff's LTD benefits, and this policy was in effect well before M.S.A. § 60A.42 became effective.[4]

The arbitrary and capricious standard is a deferential one.  An administrator's decision is arbitrary and capricious only "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Miller*, 632 F.3d at 845 (quotations and citations omitted).  "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Soubik v. Dir. Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004).  To decide whether an administrator's termination of benefits is arbitrary and capricious, courts "'determine lawfulness by taking account of several different, often case-

---

[4]      By letter dated February 15, 2021, Plaintiff submitted a February 5, 2021 decision from the United States District Court for the District of Minnesota in *Kaminski v. UNUM Life Ins. Co. of Am.*, No. 19-1997, 2021 WL 411438 (D. Minn. Feb. 5, 2021).  Plaintiff requested that the Court review the decision as supplemental authority in further support of his argument that the Court should apply a *de novo* standard of review to the Administrator's decision to deny him LTD benefits.  Plaintiff argues that this case is persuasive because the court found that a May 1, 2016 amendment to a disability policy subjects the policy to M.S.A. § 60A.42, and thereby voids the policy's discretionary clause.  I find this case distinguishable.  Unlike the ERISA policy here, the policy in *Kaminski* did not contain vesting language, *i.e.*, that the amendments to the LTD Policy only applied to disabilities that arose after the effective dates of those amendments.  Rather, the amendment to the policy in *Kaminski* simply stated, "[t]he entire policy is replaced by the policy attached to this amendment."  *Kaminski*, No. 19-1997, 2021 WL 411438, at *22 (D. Minn. Feb. 5, 2021).  In that regard, because the amendment did not identify any new provisions or specific, discrete changes to the prior policy, the court found that the "wholesale replacement" of the policy constituted a renewal, which, in turn, subjected the policy to the prohibitions mandated by M.S.A. § 60A.42.  *Id.* at 25-26.  That is clearly not the case, here.

specific, factors, reaching a result by weighing all together.'"  *Miller*, 632 F.3d at 855 (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

Among the factors that the Third Circuit has found important in determining whether a denial of benefits under ERISA is arbitrary and capricious are whether: (1) the administrator considered all medical diagnoses of the claimant; (2) the administrator considered the claimant's ability to perform his or her job requirements under the relevant diagnoses; (3) benefits determinations were reversed without additional evidence; (4) there was a disregard of opinions previously relied on; (5) the selection of evidence or medical reviews was self-serving; (6) the administrator without justification relied on the opinions of non-treating physicians more than the opinions of treating physicians; (7) the administrator relied on inadequate evidence; and (8) the administrator failed to comply with Section 504 of ERISA. *See Miller*, 632 F.3d at 848-55.  Any one factor could act as a tiebreaker when the other factors are closely balanced.  The greater "the tiebreaking factor's inherent or case-specific importance[,]" the less closely the other factors must be balanced for that tiebreaking factor to be decisive.  *Glenn*, 554 U.S. at 116.  The relative weight of these factors is determined by the circumstances of each case.  *Id.* at 115; *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009).

Under the arbitrary and capricious standard of review, courts must limit their review of the plan administrator's denial of benefits to only the evidence that was before the administrator when the decision was made.  *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997), abrogated on other grounds as recognized by *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 847 (3d Cir. 2011) (finding that under an arbitrary and capricious standard of review, the court looks to the record as a whole, and that "whole" record consists of evidence that was before administrator when the decision being reviewed was made).  However, this limitation refers to the merits of the

20

administrator's decision.   This general restriction does not prohibit a district court from considering extra-record materials related to an administrator's conflict of interest or any procedural irregularities that occurred during the reviewing process. *See Otto v. W. Pa. Teamsters and Employers Pension Fund*, 127 Fed. Appx. 17, 21 n. 7 (3d Cir. 2005) (stating "[e]vidence beyond the administrative record may in certain circumstances be relevant and admissible as to issues ... such as trustee conflict of interest, bias, or a pattern of inconsistent benefit decisions"); *O'Malley v. Sun Life Ins. Co. of Am.*, 2006 WL 182099, at *7 (D.N.J. Jan. 23, 2006) (stating "this Court may consider evidence [beyond the administrative record] of a pattern of inconsistent benefit decisions by Defendant ...").

Indeed, a modified arbitrary and capricious standard is proper "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." *Meyers v. GE Grp. Life Assur. Co.*, No. 04-5488, 2006 WL 680993, at *8 (D.N.J. Mar. 10, 2006) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 115).

Here, Liberty is responsible for funding the LTD Policy. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (finding a conflict of interest where the entity responsible for determining benefits eligibility also pays the benefits).   Thus, where a structural conflict of interest exists, "the governing standard requires the plaintiff to show that the denial of benefits was arbitrary and capricious, with a conflict of interest as simply one factor for the court's consideration." *Dunn v. Reed Grp., Inc.*, No. 08-1632, 2009 WL 2848662, at *9 (D.N.J. Sept. 2, 2009).   While the Court may consider the conflict of interest as one of several factors in its analysis, s*ee Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009), Plaintiff does not argue, nor is there any evidence, of conflict in this case.   Rather, Liberty adopted a number of safeguards to alleviate concerns regarding structural conflicts, including different claim examiners at each stage of the

review process and multiple consulting medical professionals that were selected by outside medical vendors.  Plaintiff makes no suggestions that these safeguards are not sufficient to alleviate the structural conflict of interest.  Accordingly, courts in the Third Circuit have generally applied little weight to alleged structural conflicts where such safeguards are apparent.  *See*, *e.g.*, *Irgon v. Lincoln Nat'l Corp.*, 2014 WL 12718984, at *8 (D.N.J. Oct. 23, 2014) (conflict is not important factor when administrator demonstrated existence of safeguards).

## III.   **DISCUSSION**

Hocheiser argues that the termination of his benefits was arbitrary and capricious, because (1) the FCE findings are supported by the objective evidence in the record; (2) Liberty's surveillance investigations do not support its termination of benefits; (3) Liberty failed to conduct an Independent Medical Evaluation ("IME"); and (4) Liberty has not proven that Hocheiser can perform another qualifying occupation.  In response, and in support of its motion for summary judgment, Liberty argues that its determination that Plaintiff failed to meet his burden of proving his disability was reasonable and supported by the medical evidence.

### A.   **The FCE Findings[5]**

Hocheiser argues that the FCE report authored by Rader Smith provides the only third-party, in-person assessment of Plaintiff's physical restrictions and limitation, and it was not sufficiently considered by Liberty in evaluating Plaintiff's LTD benefits claim.  (Pl. Moving Br. at 17.)  According to Plaintiff, Rader Smith directly assessed his cervical, lumbar, shoulder, elbow, forearm, wrist, and hand range of motion; his muscle strength; his hand function and clerical skills; his sitting and standing tolerances; and his ability to lift and carry for approximately three hours

---

[5]   Since I have extensively recited the record in the Factual Background section of this Opinion and provided record citations, I will not re-cite the record in this Discussion section.  I will only cite to the record where necessary.

and forty-five minutes.  (*Id.* at 18.)  Based on his performance during these tests, Hocheiser maintains that Rader Smith concluded that he cannot sustain any level of consistent functionality in a normal work environment.  (*Id.*)  Despite the FCE report being "the single most important document in the record," Plaintiff argues that Liberty failed to sufficiently address the report and, instead, adopted a different report completed by a non-examining physician.  Moreover, to the extent Liberty had certain requirements or qualifications for a valid FCE, Liberty did not communicate those requirements to Hocheiser.  (*Id.* at 22.)

In response, Liberty maintains that the FCE was not sufficient proof of Hocheiser's disability.  (Liberty Opp. Br. at 6.)  According to Liberty, unless the FCE contains "robust validity testing," which Liberty claims the one conducted by Rader Smith does not, the claimant can "completely dictate the results by deciding how much effort to put forth" during testing.  (*Id.* at 6-7.)

Here, Plaintiff asks the Court to essentially find that the Administrator should have disregarded years of medical evidence, including documentation and clinical assessments from reviewing board certified physicians, in favor of the FCE report.  I am not so inclined.  At the outset, Liberty's denial of Plaintiff's Second Appeal adequately addressed the FCE.  Indeed, Liberty acknowledged that it considered the FCE as part of Plaintiff's administrative appeal, and accurately recited that the FCE "concluded that Mr. Hocheiser is able to perform isolated tasks at the sedentary, light, and medium physical demand levels, although he is unable to sustain work at any physical demand level, including sedentary."  (Admin. Record at 154.)  Dr. Kaplan indicated that despite this conclusion, however, the FCE was not particularly reliable.  (*Id.* at 157.)  As explained by Liberty, unless the FCE contains robust validity testing, the claimant can influence the results based on the amount of effort he puts forth during the evaluation.  *See, e.g., Gorbacheva*

*v. Abbott Labs. Ext. Disability Plan*, 309 F. Supp. 3d 756, 771 (N.D. Cal. 2018), *aff'd*, 794 F. App'x 590 (9th Cir. 2019) (affirming administrator's decision to give FCE little weight on the basis that validity testing was insufficient to determine whether plaintiff was putting forth full effort); *see also Ness v. Aetna Life Ins. Co.*, 257 F. Supp. 3d 1280, 1285 (M.D. Fla. 2017) (holding that FCE was entitled to weight when it included "49 validity criteria"). In denying Plaintiff's LTD benefits claim, Dr. Kaplan reasoned that the only objective measure included in Plaintiff's FCE was grip strength testing, during which Hocheiser appeared to have exhibited full effort. (Admin. Record at 157.) Hocheiser's effort during the remainder of the testing, however, was limited by his subjective complaints, and therefore, any findings would represent the "minimum, rather than maximal capacity." (*Id.*)

Moreover, to the extent that Plaintiff argues the FCE is entitled to significant weight simply because its findings were consistent with those of his treating providers, that position is also unsupported by the record. As discussed in more detail, *infra*, findings of restricted range of motion and stiffness do not represent the entire calculus when determining whether a claimant is entitled to LTD benefits. Rather, it is critical whether those symptoms, along with Plaintiff's other reported symptoms, constitute sufficient proof of disability, such that Liberty could determine that Plaintiff can no longer perform his Own Occupation. Accordingly, Liberty's decision to afford less weight to the FCE report was not arbitrary and capricious.

### B.    Liberty's Surveillance Investigations

Hocheiser further argues that the results of Liberty's surveillance, and its investigation into Fields of Dreams, LLC/Sportika, do not support its decision to terminate his LTD benefits. (Pl. Moving Br. at 23.) Specifically, Hocheiser asserts that over the course of his claim, Liberty attempted to surveil him on at least nineteen different days, including surveillance of Sportika and

at Plaintiff's neurologist's office.  (*Id.*)  However, despite this surveillance, Hocheiser maintains that Liberty only captured him on video for approximately five total minutes, and more importantly, none of the activities observed by Liberty disprove the FCE findings or the reports of disability provided by Hocheiser's treating physicians.  (*Id.* at 23-24.)  With respect to his work with Sportika, Hocheiser argues that simply because he was capable of posting to Facebook, promoting Sportika online, and attending Planning Board meetings, does not mean he could perform "at anything close to a full-time work capacity."  (*Id.* at 26.)

Liberty counters Hocheiser's position, arguing that its surveillance and investigative findings revealed that Plaintiff "essentially started a new career after 'retiring' from his mortgage job due to back pain." According to Liberty, this evidence clearly supports its decision that Plaintiff failed to provide proof of disability, and that Plaintiff could perform, at least, sedentary work.

Because I find the surveillance and other investigatory evidence considered by Liberty to be consistent with Liberty's determination that Hocheiser is not disabled under the terms and definitions of the LTD Policy, I agree with Liberty.  As articulated correctly by Liberty, making a disability determination requires assessment of many pieces of medical, vocational, and financial information.  Thus, surveillance observations, social media evidence, and public records are investigatory tools that can provide objective evidence of the claimant's functionality and overall severity of disability.  These tools assist claims administrators in their job to assess the weight to apply a claimant's subjective complaints, particularly to the extent the investigation reveals information that conflicts with the claimant's statements.  *See*, *e.g.*, *Menes v. Chubb & Son*, 101 F. Supp. 3d 427, 434 (D.N.J. 2015) (affirming administrator's decision when surveillance contradicted plaintiff's self-reported limitations); *Digiacomo v. Prudential Ins. Co. of Am.*, 501 F. Supp. 2d 626, 633 (D.N.J. 2007) (same); *Palma v. Harleysville Life Ins. Co.*, 2013 WL 6840512,

at *10 (D.N.J. Dec. 23, 2013) (finding that "the video surveillance directly contradicts not only [the plaintiff's] subjective reports of her symptoms, but also those of her own treating physicians.").

Here, I find that the observations collected during Liberty's surveillance of Hocheiser, in addition to the documentary evidence obtained through public records and internet searches, support the conclusions of Liberty's reviewing physicians who examined Plaintiff's extensive claim file. When Hocheiser filed his disability claim with Liberty, he reported that he was unable to work due to pain and stiffness in his neck and back. (Liberty SOF, ¶ 36.) He told Liberty that his impairment was "related to a genetic disorder, [acromicric] dysplasia," that he lays down most of the day, and generally, does "a lot of nothing." Indeed, Hocheiser told Liberty that he would "never . . . work again." (Liberty SOF, ¶ 63.) When asked about his activities and current work, however, Hocheiser only disclosed that he "has an eBay business selling sports cards but loses money." Hocheiser did not disclose his involvement in the development of Sportika— a 170,000 square feet facility that markets itself as one of the largest sports-complex in the tri-state area. (Admin. Record at 310.) In fact, Hocheiser did not disclose his work in connection with Fields of Dreams, LLC/Sportika, which, according to business records was formed in November 2013 by Hocheiser and a business partner, until he submitted his Activities Questionnaire to Liberty on January 2, 2015.

From November 2013 to January 2015—a period when Hocheiser was purportedly unable to work as a Mortgage Consultant for Wells Fargo—Liberty's investigation revealed that Plaintiff worked extensively to develop Sportika. Hocheiser and his business partner formed Fields of Dreams, LLC in November 2013, developed a business strategy for the project that outlined their vision of providing the largest, all-encompassing sports and entertainment complex in the Tri-State

area, and acquired twenty-two acres of vacant land in Manalapan Township to serve as the site of Sportika.  Indeed, as part of the site's development, Hocheiser attended three public meetings before the Manalapan Township Planning Board on June 12, 2014; June 26, 2014; and July 24, 2014, related to Sportika's site plan application and other land use approvals.  (Liberty SOF, at ¶¶ 106, 107, 109.)  Video recordings of the meetings obtained by Liberty show that Hocheiser attended the meetings, each of which lasted between three hours and nearly five hours, sat in the front row behind counsel's table for the duration of the meetings, and generally exhibited no frequent change in position or other pain or discomfort while sitting.

Moreover, Liberty's investigation revealed that Hocheiser and his business partner opened a temporary location, which they deemed "Mini-Sportika" in Howell, New Jersey in 2014, to prove that their model was sustainable.  (Admin. Record at 301-09.)  Thereafter, they began assembling "a team of experts with experience in managing sports programs," including the acquisition of a successful baseball academy, soccer academy, and softball academy.  (Id.)  The partners then worked with a local architect and engineer to design and build the complex, while also attracting private investors.[6]  (Id.)  Finally, a news article discussing Sportika suggests that Hocheiser views Sportika as a long-term endeavor, as evidenced by his statement that, "Sportika New Jersey is only the tip of the proverbial iceberg."  (Id. at 309.)

Accordingly, I find that the surveillance and investigatory evidence procured by Liberty supports its decision that Plaintiff failed to provide proof of disability as of May 2016.

---

[6]     Indeed, Hocheiser secured an $11.55 million loan from AVANA Capital, and he was the only Field of Dreams, LLC/Sportika representative quoted in a corresponding press release.  (Liberty SOF, ¶ 316).

###### C.   Liberty's Failure to Perform an Independent Medical Evaluation

Hocheiser argues that the fact that Liberty eschewed an IME, despite the recommendation of its own reviewing physicians, for paper reviews, weighs in favor of finding arbitrariness.  (Pl. Moving Br. at 26-27.)   According to Hocheiser, "an ERISA plan administrator behaves unreasonably by ignoring the recommendations of its consulting physicians to pursue further evidence."  (*Id.* at 28) (citing *Simon v. Prudential Ins. Co. of Am.*, 2011 WL 2971203, at *5 (D. N.J. July 20, 2011).  Moreover, Hocheiser claims that Liberty's decision not to pursue an IME is especially troublesome because his claim was largely based on subjective complaints of pain.  (Id. at 30) (citing *Patterson v. Aetna Life Ins. Co.*, 2017 WL 4786562, at *10–11 (D.N.J. Oct. 23, 2017), *aff'd*, 763 F. App'x 268 (3d Cir. 2019).

In response, Liberty acknowledges that although its physicians initially believed an IME might be helpful, the LTD Policy did not require one.  (Liberty Opp. Br. at 19.)  Moreover, Liberty argues that an IME was not ultimately necessary because its review of Plaintiff's medical records, coupled with its own investigation of Plaintiff's claims, demonstrated that Liberty had sufficient information to assess Plaintiff's credibility, such that an in-person examination was not necessary. (Id. at 26.)  Put simply, Liberty maintains that Plaintiff had the burden to provide satisfactory proof of disability and Liberty had no duty to disprove his claim.  (*Id.* at 19.)

It is well-settled that an administrator's decision to forego an IME and rely solely on paper reviews is not *per se* arbitrary, however, it is a factor to consider in a court's overall assessment of the reasonableness of the administrator's decision-making process.  *Kelly v. Reliance Standard Life Ins. Co.*, 2011 WL 6756932, at *6 (D.N.J. Dec. 22, 2011); *Osborne v. Aetna*, 2013 WL 3168657, at *7 (D.N.J. Jun. 20, 2013); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.

Supp. 2d 261, 296 (W.D. Pa. 2008); *Schwarzwaelder v. Merril Lynch & Company, Inc.*, 606 F.

Supp. 2d 546, 559-60 (W.D. Pa. 2009).

As a preliminary matter, although Plaintiff does not raise this as an issue in his Motion for

Summary Judgment, I do not find any procedural irregularities with respect to Liberty's decision

to deny Hocheiser's LTD benefits claim after it initially granted those benefits.   Indeed, in

accordance with the LTD Policy, Liberty had the right and opportunity to examine or evaluate

Plaintiff at "reasonable intervals" whenever such examination or evaluation was "deemed

necessary <u>by Liberty</u>."  (Admin. Record at 3956) (emphasis added.)  Moreover, the LTD Policy

provides, in relevant part, that with respect to the discontinuation of LTD benefits, the benefit will

cease when a covered individual either "fails to provide Proof of continued Disability or Partial

Disability and Regular Attendance of a Physician" or "fails to cooperate in the administration of

the claim," such as not providing information or documents needed to determine whether benefits

are payable.  (Admin. Record. at 3949.)

In December 2014, Liberty approved Plaintiff's LTD benefits claim based primarily on the

report issued by Dr. Alpers.  In his report, Dr. Alpers found that his review of Plaintiff's medical

records revealed that Hocheiser was "effectively incapable of working from September 24, 2013

forward." (Admin. Record at 3151.)  In reaching this conclusion, Dr. Alpers reasoned as follows:

> [Hocheiser's] clinical syndrome is characterized by dysmorphic
> features, muscle hypertrophy, pathological hyperreflexia, spasticity,
> mild weakness, and severe neck and low back pain. <u>There appears
> to be a genetic basis for these findings on the basis of similar features
> in his children though the exact diagnosis remains to be established.</u>
> Regardless, his clinical syndrome has resulted in a considerable
> amount of functional impairment, primarily relating to refractory
> and severe neck and low back pain.

(*Id.*) (emphasis added.)  Dr. Alpers further recommended that because an exact diagnosis based on

genetic testing remained unclear and a search for that diagnosis was ongoing, that Liberty review

Plaintiff's case again in two years.  Thus, while Liberty approved Plaintiff's LTD benefits claim at that time, the Court does not find any procedural irregularity simply because Liberty continued to request medical documentation from Plaintiff and his treating providers regarding his underlying symptoms and the presence of a potential genetic disorder.  Indeed, the LTD Policy provided for such further investigation, particularly since Liberty's claim approval decision was based on Dr. Alpers's report, which recommended follow-up reviews.  Moreover, it is not disputed that Plaintiff affirmatively inquired about Liberty's partial disability policy just days after Liberty approved his claim—a conversation which alerted Liberty that Plaintiff might be capable of working in some capacity.  Accordingly, given the clear and unambiguous language of the LTD Policy and the basis for Liberty's approval of Hocheiser's claim, Liberty's decision to request additional medical documentation from Plaintiff's treating providers and perform further investigation into Plaintiff's disability claim was reasonable.

Moreover, I find that the evidence in the record supports Liberty's decision to overturn its prior approval of Plaintiff's LTD benefits claim, and deny Plaintiff's Second Appeal, without an IME.  First, as discussed above, Liberty's decision to approve Plaintiff's LTD benefits claim was largely based on Dr. Alpers's report, as well as similar medical evidence in Plaintiff's file at the time, which contemplated that Plaintiff might suffer from a genetic disorder.  Liberty's subsequent investigation, however, revealed that there was no genetic component to Plaintiff's subjective complaints of pain and stiffness.

First, the record indicates that Dr. Frisso Potts, a neurologist, performed a neurological review of Plaintiff's file at Liberty's request.  In addition to reviewing Plaintiff's medical documentation, Dr. Potts also spoke with two of Plaintiff's providers, including Dr. Hirano.  With respect to Plaintiff's claims of a genetic disorder, Dr. Hirano informed Dr. Potts that he was

"uncertain whether Mr. Hocheiser has a genetic disorder" and that "no objective neuromuscular abnormalities [existed] that would prevent [Plaintiff] from conducting light work; however, he claims pain and stiffness prevents him from working." (Admin. Record at 2759-60.)  As such, Dr. Potts concluded that Hocheiser "does not appear to have a hereditary neurological disorder that would account for his clinical state" and suggested that "review by a neurogeneticist may be considered." (*Id.* at 2761.) Indeed, Dr. Potts explained that Hocheiser had undergone extensive genetic testing for a variety of potential hereditary diseases, all of which were normal.  (*Id.* 2762-63.) She further explained:

> The hereditable conditions mentioned all have distinct physical features (phenotype) such as short stature, short limbs, facial dysmorphism, etc. . . . The claimant has none of these features. He has said that his children have these features and that is how the diagnosis was made in them [note that he does not report or offer evidence of genetic testing for his children]. There is no evidence the claimant has an inherited disorder on phenotypic or genotypic grounds.

(*Id.* at 2762-63.)

In accordance with Dr. Potts's recommendation, Liberty requested that Dr. Garry Cutting, a Johns Hopkins professor and genetics specialist, review Plaintiff's file and answer specific questions about Hocheiser's genetic condition and functionality.[7]  (*Id.* at 1687, 1720.)  Dr. Cutting concluded that it is unlikely that Hocheiser has acromicric dysplasia, geleophysic dysplasia, or a genetic form of muscular dystrophy.  (*Id.* at 1191-1192.)  Specifically, Dr. Cutting reasoned that while some features suggestive of acromicric dysplasia were reported in Hocheiser's daughter when she was younger, evaluation of Plaintiff by Dr. Julie Hoover-Fong at Johns Hopkins, who is

---

[7]     Dr. Cutting, who graduated from medical school in 1983, was the director of Johns Hopkins's postdoctoral treating programs in medical genetics and its DNA diagnostic laboratory. (*Id.* at 1720.)

an expert in skeletal dysplasias, did not reveal any features consistent with a diagnosis of acromicric dysplasia apart from the finding of muscle hypertrophy and a hoarse voice. (*Id.* at 1604-05.)  Indeed, Dr. Cutting determined that with the exception of muscle hypertrophy and stiffness, there were no specific findings in Plaintiff indicative of acromicric dysplasia or geleophysic dysplasia upon exam by Dr. Hoover-Fong. (*Id.*)  Notably, Dr. Cutting also emphasized that even if it could be shown that Hocheiser suffered from one of these genetic disorders, its presence would not *per se* imply functional impairment such that he could not work. (*Id.*)

Moreover, treatment notes from Hocheiser's own providers and diagnostic testing performed <u>after</u> Liberty's initial approval of LTD benefits provided no evidence of a genetic disorder or objective diagnosis.  Indeed, as Dr. Cutting discussed in his report, Hocheiser visited Dr. Hoover-Fong at Johns Hopkins on June 15, 2015, for a genetics consultation. (*Id.* at 2236.) Despite Plaintiff's reports of muscle stiffness and pain, Dr. Hoover-Fong noted that "extensive testing" to date was negative. (*Id.* at 2237.)  To that end, she recommended that Plaintiff undergo whole exome sequencing and an echocardiogram. (*Id.* at 2239.)  On March 14, 2016, a Johns Hopkins representative verbally notified Liberty that the exome sequencing results came back "non-diagnostic," meaning they did not demonstrate the presence of a genetic disorder.[8] (*Id.* at 20.)  Therefore, while Hocheiser continued to claim during his Second Appeal that he suffers from a genetic disorder, no conclusive genetic disorder has been identified by any objective or diagnostic evidence.

---

[8]     Liberty was unable to obtain the complete genetic testing results because Hocheiser failed to complete the required Johns Hopkins's authorization form. (Admin. Record at 15)

Moreover, independent from this new evidence regarding Plaintiff's lack of a genetic disorder, additional medical documentation, subsequent conversations with Plaintiff's treating providers, and new insights into Plaintiff's involvement with Fields of Dreams, LLC/Sportika, demonstrated that changed circumstances existed to terminate Plaintiff's LTD benefits. Indeed, over the course of his claim, Hocheiser treated with at least sixteen providers. The record reveals, however, that eight of those providers declined to offer an opinion on Plaintiff's functionality; two providers provided early support for his claim, but did not offer any opinion beyond 2014; and four providers eventually indicated to Liberty that Plaintiff could perform work, at least in a sedentary capacity. (Liberty SOF, at ¶ 385.)

Accordingly, the only two providers to support Plaintiff's claim for disability throughout the entirety of the claims process were Drs. Herman and Leitch. Dr. Herman began treating Plaintiff in 2014, and regularly treated Plaintiff in 2015. At that time, he initially told Liberty that Plaintiff could perform sedentary work on a full-time basis from home. (Liberty SOF, at ¶¶ 204, 245.) Indeed, Dr. Herman advised that if Hocheiser were to request a full-time work release, for return to his sedentary occupation as Mortgage Consultant, he would not hesitate to release him back to work. (Admin. Record at 1771.) While Plaintiff stopped treating with Dr. Herman in May 2015, he treated with him once in July 2016. Following the July 2016 visit, Dr. Herman reported that over the past fourteen months, Hocheiser had experienced increased pain, muscle tightness and spasms. (Admin. Record at 829.) Therefore, Dr. Herman acknowledged that while in the past, he found that Hocheiser could work from home with frequent breaks to allow for stretching and mobilization, he no longer believed that to be a viable option, in light of Hocheiser's "progressive physical deterioration." (*Id.*) Notably, however, Dr. Herman's opinions in both 2014 and 2015, do not appear to be based on any functional testing, analysis, or objective evaluation. Rather, his

findings appear to be based on Hocheiser's subjective complaints of pain and stiffness.  In fact, the medical documentation shows that during Dr. Herman's examinations of Plaintiff, Hocheiser's gait, stride, cadence, and balance were normal, and he also generally displayed normal strength, tone, and sensation.  (Admin. Record at 2830, 2594, 2596).

As for Dr. Leitch, her findings also appear to lack objective evidence.  Plaintiff first consulted with her in December 2013, at which time she reported that based on Plaintiff's muscle stiffness and neck and back pain, he could not work.  Specifically, Dr. Leitch reported that she was unsure how long Hocheiser could not work, but that he should "remain off of work while [she] continue[s] to investigate what might be the cause of his symptoms."  (Admin. Record at 2061.) Similarly, in connection with his First Appeal, Plaintiff provided a letter from Dr. Leitch stating that Hocheiser "continues to suffer with severe muscle spasms, headaches as well as neck and back pain," however, "[h]is exact diagnosis is not yet known."  (Admin. Record at 3200.)  According to Dr. Leitch, "these symptoms are causing him significant functional disability."  (*Id.*)  Later, in connection with Plaintiff's Second Appeal, Dr. Leitch also provided Liberty with a Restrictions Form, in which she indicated that Plaintiff was "[f]ully disabled," because he could not do "any lifting" or "stand or sit for regulated amounts of time." According to Dr. Leitch, Hocheiser was "in physical therapy but he suffers from a genetic, progressive degenerative condition.[9]  His symptoms will not improve."

There is no doubt that Hocheiser reported subjective pain.  The difficulty, as explained by each of Liberty's reviewing doctors, is that there is no objective evidence to prove the effect of Hocheiser's complaints of pain on his ability to work.  *See Dolfi v. Disability Reins. Mgmt. Servs.,*

---

[9]     Notably, no diagnostic or objective medical evidence exists in the record demonstrating that Plaintiff suffers from a genetic disorder.  In fact, all testing and genetic evaluations revealed no such diagnosis.

*Inc.*, 584 F.Supp.2d 709, 735 (M.D. Pa. 2008) (medical consultants' findings that the plaintiff's subjective complaints of pain are inconsistent with the objective evidence available is not arbitrary and capricious).  In other words, the inquiry is not whether Plaintiff experienced pain—which the parties do not dispute—rather, the question is whether Plaintiff's pain, at whatever level, had any effect on his capacity to work.

On that issue, it was well supported that Hocheiser could work in a sedentary capacity with certain restrictions, and therefore, Liberty's decision to forego an IME was not arbitrary and capricious.  Indeed, when Liberty terminated Plaintiff's LTD benefits in May 2016, it considered medical records received from Hocheiser's providers; letters and correspondence received from Hocheiser and his attorney; surveillance, business records, and internet reports; and clinical reviews and a transferrable skills analysis.  (Admin. Record at 1183-97.)

As for the medical documentation, Liberty received records from twelve separate sources, including: Drs. Leitch, Rizvi, Peter Lapman, Herman, Brokstein, Hirano, and Johnson; Johns Hopkins Medicine's Genetics Department, CVS Pharmacy, the Kennedy Krieger Institute's Muscle Disorder Clinic, and CentraState Healthcare's Rehabilitation Department.  (*Id.* at 1184-85.)  In addition to this medical documentation, Liberty also reviewed all previously received medical documentation received since commencement of Hocheiser's initial claim.  (*Id.*)

Given the complexity of Hocheiser's condition, Liberty then conducted multiple clinical reviews of Plaintiff's file and medical records to understand his level of impairment and his sustained functional capacity.  In addition to the clinical reviews completed by Dr. Potts and Dr. Cutting, discussed *supra*, Dr. Gale G. Brown, Jr., and Dr. Rajat Gupta also reviewed Plaintiff's claim file.  When asked to discuss Plaintiff's functionality, Dr. Brown concluded, like Dr. Potts, that Plaintiff was capable of full-time sedentary work.  (*Id.* at 2571-72.)  In support of her

conclusion, Dr. Brown emphasized that Plaintiff's MRI results were mild, surgery was unnecessary, and she also cited the surveillance observations obtained by Liberty, including Plaintiff's attendance at sports events and Sportika.[10] (*Id.* at 2571-85.) As for Dr. Rajat Gupta, a Board Certified physician in neurology and pain medicine, he concluded that Hocheiser "is impaired in his capacity to perform certain physical functions" due to his spinal pain." (*Id.* at 1376.) As a result, Dr. Gupta outlined several restrictions for Hocheiser, including no lifting or carrying more than ten pounds occasionally and up to five pounds frequently and no standing or walking for more than two hours in an eight-hour day. (*Id.* at 1377.) With respect to sitting, Dr. Gupta found that Hocheiser is without restrictions, but he should be allowed to change position and stretch every thirty minutes. (*Id.*) Like Dr. Potts, Dr. Gupta also spoke with several of Plaintiff's treating providers, including Gramata and Drs. Julie Hoover-Fong and Leitch. Dr. Hoover-Fang stated "[s]he did not appreciate any significant deficits to his physical functioning during her evaluation, except for some increased muscle bulk and hypertonia" and "his complaints are mainly that of subjective pain." (*Id.* at 1385.) As for Dr. Leitch, she stated, contrary to her Restrictions Form, that "[b]ecause of the mainly subjective nature of his complaints, . . . she was not able to provide an opinion on his capacity to return to his prior position." (*Id.* at 1383.)[11]  In sum, the clinical reviews performed by physicians trained and certified in the respective medical disciplines, which considered conversations and correspondence with Hocheiser's treating

---

[10]    Although with respect to Sportika, Dr. Brown acknowledged at the time that Plaintiff's level of involvement was uncertain. (Admin. Record at 2574.)

[11]    However, when Dr. Gupta sent Dr. Leitch a letter summarizing their conversation, she responded that she could not "agree with the restrictions and limitations outlined by Dr. Gupta." (Admin. Record at 1363.) According to Dr. Leitch, "[Hocheiser] has told me on numerous occasions that he has too much pain to work at his previous job." (*Id.*) Dr. Leitch indicated that Hocheiser is "very stiff with significant loss of normal range of motion at his neck, back, hips and knees," and that he has "significant pain with movement." (*Id.*)

providers, concluded that although Hocheiser suffers from functional impairment associated with his cervical and lumbar spine diagnoses, as well as gait disorder and issues with his hips and right shoulder, he is capable of performing full-time work at a sedentary physical demand level. (*Id.* at 1187-1189.)

This was also confirmed by Liberty's review on Plaintiff's Second Appeal.[12]   Again, Liberty considered Hocheiser's entire claim file, including newly received medical records and documentation provided by Hocheiser's treating providers; the FCE and subsequent report issued by Rader Smith; and new evidence related to Hocheiser's business activities with Fields of Dreams, LLC/Sportika.  (*Id.* at 143-163.)   Specifically, Dr. Mark Kaplan, a Board Certified physician in Pain Management and Rehabilitation, Pain Medicine, and Spinal Cord Injury Medicine, reviewed Plaintiff's medical documentation.  (*Id.* at 156-157.)  Dr. Kaplan reported the diagnoses supported by the medical evidence include "hypertension, obstructive sleep apnea, anxiety, hyperlipidemia, obesity, right lower extremity deep vein thrombosis, and the claimant has a chronic neuromuscular condition without established diagnosis."  (*Id.* at 157.)  With respect to the August 2016 and July 2015 brain, cervical, thoracic and lumbar MRIs, Dr. Kaplan explained, "[t]he testing done showed degenerative changes of the spine which is of indeterminant significance as these findings are commonly seen in asymptomatic individuals and would be more likely to be associated with obesity as in this case.  Imaging of the brain was normal.  None of these tests explains the claimant's physical examination findings or reported symptoms."  (*Id.*)  Dr.

---

[12]     Despite Hocheiser's claims during his Second Appeal that his condition had "regressed," that assertion was not supported by the medical evidence.  Notably, at Plaintiff's most recent physical examination on file, which occurred on July 9, 2016, Dr. Vinay Chaudhry, a neurologist, reported that Hocheiser had limited range of motion, but normal muscle tone, steady gait, no clear sensory loss or weakness, and no hypertrophy of a significant degree.

Kaplan also discussed Hocheiser's claim with Dr. Rizvi, Hocheiser's primary care provider, <u>who agreed that Hocheiser would be able to perform work at a seated level</u>.  (*Id.* at 156-57.)

Moreover, as explained in greater detail above, Liberty's surveillance and investigation into Hocheiser's daily activities following Liberty's approval of his disability claim in December 2014, suggested that he was capable of working in some capacity.  Indeed, when Liberty approved Hocheiser's claim in December 2014, it was unaware that Plaintiff had formed the limited liability company in 2013, and he had been actively taking steps to develop Sportika.  To be clear, Hocheiser developed one of the largest indoor sports and entertainment complexes in the tri-state area between 2014 and 2016—the exact period that he received his LTD benefits.  Thus, while Drs. Herman and Leitch may have opined that Hocheiser was disabled, on balance, there was sufficient evidence, documented by other providers who treated Hocheiser, consulting physicians who reviewed Hocheiser's entire claim file, and by Liberty's extensive investigatory efforts into Hocheiser's daily activities to find that Plaintiff, as of May 2016, was capable of sedentary work.

In sum, Liberty's conclusion that Plaintiff failed to meet his burden as of May 2016 was supported by: (1) the opinions of several of Plaintiff's own treating providers, including Drs. Rizvi, Hirano, Hoover-Fong, and Lapman; (2) the contemporaneous medical records, which consistently lacked any diagnostic or objective explanation, aside from subjective symptoms of pain and stiffness; (3) the absence of a "genetic disorder" (or any other similar diagnosis) causing Plaintiff's alleged disabling symptoms; (4) evidence regarding Plaintiff's demonstrated functionality, including surveillance observations related to his work in connection with Fields of Dreams/Sportika; and (5) the opinions of five independent board certified doctors, all of whom reviewed the totality of the medical information and documentation in Plaintiff's claim file.  Taking this evidence as a whole, I do not find that, under the arbitrary and capricious standard, an

IME was necessary.  Because Plaintiff did not establish a *prima facie* case, it is not a procedural irregularity nor arbitrary and capricious if a reviewer does not conduct an IME.  *Vega v. Cigna Group Insurance*, No. 06–5841, 2008 WL 205221, at *7 (D.N.J. Jan.23, 2008); *Feigenbaum v. Merrill Lynch & Co., Inc. Basic Long Term Disability Plan*, No. 06–1075, 2007 WL 2248096, at *4 n. 11 (D.N.J. Aug. 2, 2007); *see Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 47 (holding that plan administrator was not specifically required to request an additional examination unless the employee first submits proof of continuing disability).  It is not Liberty's burden to determine the existence of Plaintiff's disability; it is sufficient that Liberty determine, reasonably, that Plaintiff failed to satisfy his burden of proof.  Accordingly, I reject Hocheiser's argument that an IME in his case was necessary.

### D.     Liberty's Failure to Prove that Plaintiff Can Perform Another Qualifying Occupation

Finally, Hocheiser argues that even if the Court accepts the restrictions and limitations found by Liberty's physicians, there is still no evidence in the record that Hocheiser can perform another qualifying occupation.  (Pl. Moving Br. at 31.)  According to Hocheiser, he is entitled to LTD benefits under the Policy, if, after twenty-four months, he remains unable to return to his own occupation and cannot perform the "Material and Substantial Duties" of "any occupation that [he] is or becomes reasonably fitted by training, education, experience, age, [and] physical and mental capacity." (*Id.*)  In making this determination, Plaintiff claims that Liberty relied on a transferable skills analysis ("TSA") produced by Teresa Marques, which Plaintiff argues is deficient, because the report did not discuss whether Hocheiser could perform an alternate occupation.  (*Id.* at 31-32.)  In response, Liberty argues that even if the Court were to consider Plaintiff's "post hoc critiques" of Liberty's TSA and its vocational determination, Marques had determined that Plaintiff was physically capable of performing a sedentary occupation and identified several

sedentary occupations for which he was qualified.  (*Id.* at 29-30.)  Accordingly, because Plaintiff's functionality was deemed consistent with the physical demands of a sedentary occupation, there was no need to address each exertional and non-exertional duty of the alternative occupations like Plaintiff suggests.  (*Id.* at 30.)

As threshold matter, Plaintiff's argument fails because he did not raise this issue during the administrative process.  *See Hilbert v. Lincoln Nat'l Life Ins. Co.*, 2017 WL 2633503, at *7 (M.D. Pa. June 19, 2017), *aff'd*, 742 F. App'x 675 (3d Cir. 2018) (a plaintiff's "attempt to now challenge those vocational assessments . . . fails, as she did raise that argument during the administrative process."); *Morningred v. Delta Family-Care & Surv. Plan*, 790 F. Supp. 2d 177, 184 (D. Del. 2011), *aff'd*, 526 F. App'x 217 (3d Cir. 2013) (plaintiff "waived this issue by her failure to raise it on appeal to the plan administrator.").  Indeed, Marques completed the TSA in May 2016, and Liberty relied on the TSA in its decision to deny Plaintiff LTD benefits dated May 23, 2016. Specifically, Liberty's claim denial decision stated that, according to the TSA, Hocheiser possesses certain transferable skills in the areas of sales, finance, communications, and customer service. (*Id.* at 1194-95.)  Based on these skills, Marques determined that Plaintiff could perform the following occupations: financial sales representative, loan officer, or credit analyst.  (*Id.*)  Liberty also sent Plaintiff a copy of his entire claim file, including the TSA.  Nonetheless, Plaintiff failed to raise any issues regarding the TSA in his Second Appeal, thereby depriving Liberty of an opportunity to address any concerns.  Importantly, Plaintiff does not refute nor contest this position.

Moreover, even if the Court were to consider Plaintiff's arguments regarding the TSA, Plaintiff's position is not persuasive.  Plaintiff contends that the TSA fails to provide any discussion regarding the material duties associated with the alternative occupations, nor does it

40

contain any analysis regarding whether Hocheiser could perform these alternate occupations given his restrictions and limitations.  In support of this position, Plaintiff relies on *Shah v. Broadspire Servs., Inc.*, 2007 WL 2248155, at *6 (D.N.J. Aug. 2, 2007), in which the court, there, found that a defendant's denial of long term disability benefits was arbitrary and capricious because the defendant's employability assessment failed to determine whether a person with the plaintiff's physical limitations could perform the alternative jobs identified by the defendant's consultant. The instant case, however, is distinguishable.   In *Shah*, the court expressly found that the Employability Assessment was the "sole basis" for the defendant's conclusion that alternative jobs existed that could accommodate the plaintiff's limitations.  *Id.*  Indeed, the court reasoned that the although the Employability Assessment included a brief history of the plaintiff's injury and references to "medical records," it was not "at all clear which medical records from which of Plaintiff's treating physicians [the consultant] reviewed, and to what extent (if at all) those records informed [her] conclusions.  Thus, the court concluded that the defendant's determination that the plaintiff could physically perform certain jobs, despite his severe limitations, was based on a flawed Employability Assessment.  *Id.*  Unlike in *Shah*, the TSA was not the only basis for Liberty's conclusion that Hocheiser could perform his Own Occupation or alternative occupations. Rather, as discussed, *supra*, the overwhelming medical evidence in the record shows that Plaintiff's physical limitations would not prevent him from performing his Own Occupation or the alternative sedentary occupations identified by TSA.  *See Drach v. Sun Life Assurance Co. of Canada*, No. 15-5467, 2016 WL 5417191, at *7 (D.N.J. Sept. 28, 2016) (declining to apply *Shah* because the medical evidence in the record supported the findings in the vocational consultant's report).

41

**IV.**   <u>**CONCLUSION**</u>

For the reasons set forth above, I find that Liberty's decision denying Hocheiser's LTD benefits was not arbitrary and capricious.  Liberty's motion is **GRANTED**; and Plaintiff's motion is **DENIED**.

Dated: February 22, 2021                             <u>/s/ Freda L. Wolfson</u>
                                                                    Freda L. Wolfson
                                                                    U.S. Chief District Judge